1  **MILSTEIN ADELMAN LLP**
   Gillian L. Wade, State Bar No. 229124
2  gwade@milsteinadelman.com
   M. Isaac Miller, State Bar No. 266459
3  imiller@milsteinadelman.com
   2800 Donald Douglas Loop North
4  Santa Monica, California 90405
   Telephone:   (310) 396-9600
5  Fax:            (310) 396-9635

6  Attorneys for Plaintiff,
   Arlene Cabral and the Proposed Class
7

8

9

10                  UNITED STATES DISTRICT COURT

11                  CENTRAL DISTRICT OF CALIFORNIA

12  ARLEEN CABRAL, individually and on      )  CASE NO.: **5:12-cv-00085-MWF-OP**
13  behalf of all others similarly situated, )
                                              )
14               Plaintiffs,                   )  **CLASS ACTION**
                                              )
15          vs.                                )  **PLAINTIFF'S NOTICE OF**
                                              )  **MOTION AND MOTION FOR**
16                                             )  **CLASS CERTIFICATION;**
                                              )  **MEMORANDUM OF POINTS AND**
17  SUPPLE, LLC, a Connecticut              )  **AUTHORITIES IN SUPPORT OF**
    Corporation; and DOES 1 through 100,    )  **PLAINTIFF'S MOTION FOR**
18  inclusive,                                )  **CLASS CERTIFICATION**
                                              )
19               Defendants.                   )
                                              )  Date:     September 24, 2012
20                                             )  Time:     10:00 am
                                              )  Crtrm:    1600
21                                             )  Judge:    Hon. Michael W. Fitzgerald
                                              )
22

23

24

25

26

27

28

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

**PLEASE TAKE NOTICE** that on September 24, 2012, or on such date as may be specified by the Court, in the courtroom of the Honorable Michael W. Fitzgerald, United States District Court for the Central District of California, 312 North Spring Street, Los Angeles, California, Plaintiff Arlene Cabral ("Plaintiff"), on behalf of herself and the proposed class, will and hereby does move for class certification pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3).

Plaintiff seeks to certify the following statewide class pursuant to Rules 23(a) and 23(b)(3):

> All persons residing in the State of California who purchased Supple for
> personal use and not for resale since December 2, 2007.

This motion is brought pursuant to Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure and based on grounds that class certification is proper.

First, each of the four requirements under Rule 23(a) are met. Defendant has conceded that it "does not contest numerosity." *See* Declaration of Gillian L. Wade In Support of Plaintiff's Motion for Class Certification, ("Wade Decl.") ¶54, Ex. 52. The commonality requirement is readily satisfied because the class members' claims depend upon a common contention which is capable of classwide resolution. Further, Plaintiff's claims are typical of the claims of members of the class – all arise from the same injury, same conduct, and same standardized, material misleading representations by Defendant. Finally, Rule 23(a)(4)'s adequacy of representation requirement is also satisfied. Plaintiff does not have any conflict of interest with the proposed class, and Plaintiff and her counsel will prosecute the action vigorously on behalf of the class.

Second, class certification is appropriate under Rule 23(b)(3). Regarding each of the four causes of action alleged in the complaint, common issues predominate over any individual questions. Moreover, under the circumstances, a class action is a superior method of adjudication.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1    Accordingly, Plaintiff respectfully moves for an order: (1) allowing this action

2  to be maintained as a class action pursuant to Rule 23(a); (2) certifying a class action

3  under Rule 23(a) and Rule 23(b)(3); (3) appointing Plaintiff Arelene Cabral as

4  representative for the class; and (4) appointing the law firm of Milstein Adelman, LLP

5  ("MA") as counsel for the class.

6    This motion is brought in accordance with Local Rule 23-3 and made following

7  a conference of counsel pursuant to Local Rule 7-3, which took place on July 2, 2012.

8  *See* Wade Decl. ¶¶ 66-67.

9    This motion is based upon this Notice of Motion, the concurrently-filed motion

10 and memorandum of points and authorities in support thereof, the declaration of

11 Gillian Wade, the declaration of Arelene Cabral, all of the papers and pleadings on file

12 in this action, and upon such other and further evidence as the Court may be presented

13 at the time of the hearing.

14

15 DATED: July 17, 2012                    Attorneys for Plaintiff,

16                                          Arlene Cabral and the Proposed Class

17

18                                          By:    /s/ Gillian L. Wade

19                                              MILSTEIN ADELMAN, LLP

20                                              Gillian L. Wade

21                                              M. Isaac Miller

22

23

24

25

26

27

28

2

# **TABLE OF CONTENTS**

I.   INTRODUCTION ........................................................................................... 1

II.  PLAINTIFF WILL USE CLASS-WIDE EVIDENCE
     TO PROVE HER CASE ................................................................................ 2

     A.   Arthritis Affects 50 Million Americans And Is The Leading
          Cause Of Disability In The United States ............................................ 2

     B.   Defendant Markets And Advertises The Supple Beverage
          As An Effective Arthritis Treatment With Miraculous
          Healing Powers ..................................................................................... 3

          1.   Defendant's wildly successful infomercials make false
               promises of a cure for arthritis and joint suffering ................ 4

          2.   Defendant controls it's official and "affiliate" websites,
               which repeat the false promises of fast relief from
               arthritic joint pain .................................................................... 7

          3.   Defendant's Label Makes False Arthritic Treatment Claims
               And Admittedly Contains Unapproved Health Claims In
               Violation Of California Law .................................................... 9

     C.   Glucosamine And Chondroitin Supplementation –
          A Controversial And Unproven Therapy For Arthritis ...................... 9

          1.   The "consensus" among the scientific community is that
               glucosamine hydrochloride is no more effective than
               placebo ..................................................................................... 10

          2.   Recent evidence undermines the effectiveness of
               chondroitin sulfate ................................................................. 13

          3.   Even assuming glucosamine and/ or chondroitin had any
               effect on joint pain and suffering (which they do not),
               research indicates the effect would be "slow-acting" ............ 13

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

i

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

III.   PROPOSED CLASS DEFINITION  .................................................................14

IV.   THE PROPOSED CLASS EASILY MEETS THE REQUIREMENTS
        FOR CLASS CERTIFICATION .................................................................14

        A. This Action Satisfies The Requirement Of Rule 23(a)......................15

              1. Numerosity Is Undisputed....................................................15

              2. Commonality Is Established Because This Case Is About
                 A Common Advertising Campaign Which Gives Rise To
                 Common Questions Subject To Common Proof ..................15

              3. Typicality Is Established Because Plaintiff's Claims
                 Are  Based  On The Same Conduct And The Same Injury
                 As The Class........................................................................17

              4. Adequacy Of Representation Is Satisfied By Plaintiff
                 And Her Counsel ..................................................................18

                    a.  Neither Plaintiff Nor Her Counsel Have Any Conflict
                        of Interest With The Proposed Class............................18

                    b.  Plaintiff And Her Counsel Will Prosecute This Action
                        Vigorously ...................................................................18

                          i.    Plaintiff Cabral is an adequate class
                                representative ......................................................18

                          ii.   Plaintiff's counsel are qualified, experienced
                                and have the resources to vigorously prosecute
                                this action ...........................................................19

        B. The Court Should Certify A Rule 23(b)(3) Class ...............................19

              1. Common Issues Predominate Over Individual Issues ...........19

                    a.  Plaintiff's UCL And FAL Claims Will Be Established
                        Through Classwide Proof...............................................21

b.  Plaintiff's CLRA Claim Raises Common Questions .....22

2.  A Class Action Is The Superior Method Of Adjudication.....24

V.      CONCLUSION ...........................................................................25

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Amchem Products, Inc. v. Windsor* (1997)
　　521 U.S. 591 ............................................................................................ 14

*Bruno v. Quten Research Institute, LLC* (C.D. Cal. 2011)
　　280 F.R.D. 524  ...................................................................................... 14

*Crawford v. Honig*
　　37 F.3d 485 (9th Cir. 1994) .................................................................... 18

*Gen. Tel. Co. of Southwest v. Falcon* (1982)
　　457 U.S. 147 ............................................................................................ 17

*Haley v. Medtronic, Inc.* (C.D. Cal. 1996)
　　169 F.R.D. 643 ........................................................................................ 19

*Hanlon v. Chrysler Corp.* (9th Cir. 1998)
　　150 F.3d 1011 .................................................................. 15, 17, 18, 20, 24

*Hanon v. Dataproducts Corp.* (9th Cir. 1992)
　　976 F.2d 497 ............................................................................................ 17

*In re Abbott Laboratories Norvir Antitrust Litig.* (N.D. Cal. June 11, 2007)
　　2007 WL 1689899 ................................................................................... 21

*In re Brazilian Blowout Litigation* (C.D. Cal. April 12, 2011)
　　CV 10-8452-JFW (MANx) ..................................................................... 14

*In re Ferrero Litig.* (S.D. Cal. Nov. 15, 2011)
　　2011 U.S. Dist. LEXIS 131533 .............................................................. 21

*Jimenez v. Domino's Pizza, Inc.* (C.D. Cal. 2006)
　　238 F.R.D. 241 ........................................................................................ 18

*Johnson v. Gen Mills, Inc.* (C.D. Cal. 2011)
　　275 F.R.D. 282 .................................................................... 14, 16, 20, 25

*Keegan v. Amer. Honda Motor Co., Inc.* (C.D. Cal. June 12, 2012)
　　2012 WL 2250040 ........................................................................... 15, 24

*Mathias v. Smoking Everywhere, Inc.* (E.D. Cal. Oct. 20, 2011)
　　2011 WL 502454 ..................................................................................... 14

*Negrete v. Allianz Life Ins. Co. of N. Am.* (C.D. Cal. 2006)
　　238 F.R.D. 482  ....................................................................................... 19

*Occidental Land, Inc. v. Sup. Ct.* (1976)
　　18 Cal.3d 355............................................................................................ 22

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Stearns v. Ticketmaster Corp.* (9th Cir. 2011)
    655 F.3d 1013 ..................................................................................22, 23

*Wal-Mart Stores, Inc. v. Dukes* (2011)
    131 S.Ct. 2451 ..................................................................................15, 16

*Weiner v. Dannon Co., Inc.* (C.D. Cal. 2009)
    255 F.R.D. 658 ......................................................................19, 21, 22, 23

*Zinser v. Accufix Research Inst., Inc.* (9th Cir. 2001)
    253 F.3d 1180 ...........................................................................15, 24, 25

**STATE CASES**

*In re Steroid Hormone Product Cases* (2010)
    181 Cal.App.4th 145...............................................................................23

*In re Tobacco II* (2009)
    46 Cal.4th 298.......................................................................................21

*Lavie v. Procter & Gamble Co.* (2003)
    105 Cal.App.4th 496..............................................................................21

**STATE STATUTES**

    Cal. Civ. Code § 1780(b)(1)...................................................................24

    Cal. Civ. Code §§ 1780(b)(1)(B) ...........................................................24

    Cal. Civ. Code §§ 3345(b)(1) ................................................................24

**FEDERAL STATUTES**

Federal Rules of Civil Procedure

    23(a) ......................................................................................................15

    23(a)(3) ..................................................................................................17

    23(a)(4) ..................................................................................................18

    23(b)(3) ............................................................................................19, 23

    23(b)(3)(C)............................................................................................25

    23(b)(3)(D)............................................................................................25

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

# I.   **INTRODUCTION**

"EXTENSIVE RESEARCH CONFIRMS ARTHRITIS CAN BE HEALED." "THE ANSWER FOR JOINT PROBLEMS IN A DELICIOUS SUPPLEMENT." "JOINT RELIEF IN 7 DAYS." "COMFORT, LUBRICATE AND REBUILD YOUR JOINTS." "AN EVIDENCE BASED SOLUTION FOR JOINT PROBLEMS." These claims about the Supple Beverage, like all of the claims about the Supple beverage, are lies. Targeting the 50 million arthritis sufferers in the United States, Defendant Supple, LLC ("Defendant"/"Supple") hawks a bogus "joint relief" drink containing alleged "clinically proven" ingredients to thousands of disabled California consumers with sensational promises of an alternative, and fast acting, treatment for arthritis. This universally conveyed joint relief message—the *only* message of Defendant's advertising and the only reason for which the product is marketed and sold—is false.

In recent years, consumers afflicted with a wide range of arthritic conditions have increasingly turned to glucosamine and chondroitin as an alternative therapy. Although there is an utter lack of sound clinical proof demonstrating the effectiveness of these dietary supplements—and in fact overwhelming and conclusive evidence that these compounds have *no* effect as a treatment for arthritis (or anything else for that matter)—consumers try glucosamine and chondroitin products in hopes of a quick-fix for arthritis pain. Preying on these vulnerable consumers, Defendant markets Supple as the only proven solution for joint pain and suffering that can "rebuild joints" in a convenient, once-daily beverage. Unfortunately for consumers, the Supple beverage advertising campaign is nothing more than a well-orchestrated scam.

The issue presented by this Motion, however, is not whether Supple's advertising is in fact true and substantiated, but whether Plaintiff can present her case on a class-wide basis, using common evidence that will illicit common answers. She can. The predominant questions in this case are binary: the advertising is either misleading or not, and Supple's joint relief claims are either true or false. These

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1

predominating common questions are capable of class-wide resolution using class-wide evidence, and will generate common answers to the primary questions presented in this lawsuit.

Defendant's promises of effective treatment for arthritic joint pain were, are, and always have been the same. Every class member was exposed to Defendant's false advertising because Supple is only sold directly to consumers (not at retail). The only way to purchase the beverage is by calling a designated 800 number after viewing a Supple infomercial, or purchasing the product online from one of Defendant's websites—both of which require exposure to Defendant's false advertising prior to purchase. This fact alone satisfies predominance. Moreover, the type and amount of the two key ingredients in Supple, chondroitin sulfate and glucosamine hydrochloride, has never changed. Thus, whether Defendant's advertising is false or deceptive is a common question for every class member that can be analyzed on a class-wide basis, just as Defendant purported to do when it offered scientific studies as substantiation for its advertised claims in discovery. Plaintiff will present expert testimony and the existing scientific and medical literature (including the studies Defendant apparently relies upon as support for its claims) to establish that the ingredients in Supple do not do what Defendant promises they will. This is a question of science, which by its very nature is susceptible to class-wide evidence.

The class Plaintiff seeks to have certified is defined as all persons residing in the state of California who purchased Supple for personal use and not for re-sale since December 2, 2007.

## II.   PLAINTIFF WILL USE CLASS-WIDE EVIDENCE TO PROVE HER CASE

### A.   Arthritis Affects 50 million Americans And Is The Leading Cause Of Disability In The United States

The term arthritis means "joint inflammation" and is used in the public health world to describe about 100 different diseases that affect the joints, tissues which

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

2

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1  surround the joints, and cartilage surrounding the joints.  *See* Declaration of Gillian L.

2  Wade ISO Class Certification ("Wade Decl.") at ¶5, Ex. 3. Fifty-million adults have

3  self-reported doctor-diagnosed arthritis and 67 million adults will have doctor-

4  diagnosed arthritis by the year 2030. *Id.* ¶¶6-7, Exs. 4-5; *id.* ¶11, Ex. 9.  The three

5  most common forms of arthritis are osteoarthritis, fibromyalgia and rheumatoid

6  arthritis.[1] *Id.* ¶ 6, Ex. 4; *id.*, ¶10, Ex. 8.  Gout and lupus are also forms of arthritis. *Id.*

7  ¶10, Ex. 8. Arthritis is the nation's most common cause of disability, causing 1 of 3

8  working-age adults to report work limitations.  *Id.* ¶10, Ex. 8.  Low impact exercise is

9  the most recognized form of treatment for arthritis, followed by NSAIDs for

10  inflammation reduction, injections and cartilage transplant surgery.  *Id.* ¶6, Ex. 4; *id.*

11  ¶10, Ex. 8.  There is no cure for arthritis.  *Id.* ¶11, Ex. 9.

**B. Defendant Markets And Advertises The Supple Beverage As An Effective Arthritis Treatment With Miraculous Healing Powers**

12  Defendant uses various forms of advertising to spread the false message that the

13  Supple beverage is capable of treating and even healing arthritis, causing thousands of

14  Californian's to spend over $90 each on fruit-flavored juice.  *See id.* ¶¶ 16-31, Exs.

15  14-29.  In response to Plaintiff's required CLRA notice letter, Defendant stated

16  unequivocally "**The Supple Beverage Effectively Treats Osteoarthritis.**"  *Id.* ¶58,

17  Ex. 56.  In a nonsensical and abrupt about-face during his deposition, Defendant's

18  CEO Peter Apatow ("Apatow") stated: "I do not believe that Supple treats anything."[2]

19  *Id.* ¶ 3, Ex. 1(Deposition of Peter Apatow ("Apatow Dep.")) at 171:12–13 (all future

[1] Osteoarthritis is a progressive degenerative joint disease characterized by the breakdown of joint cartilage, and affects nearly 27 million Americans.  Rheumatoid arthritis is a systemic inflammatory disease which manifests itself in multiple joints of the body. Fibromyalgia is an arthritis-related condition that is characterized by generalized muscular pain and fatigue. Wade Decl. ¶¶8-9, Exs. 6-7.

[2] Apparently realizing the damaging effect this statement could have, Defendant went on to immediately contradict himself: "I do not believe Supple treats anything. I believe that the active ingredients in Supple have a significant amount of clinical evidence concerning their efficacy.  And when you look at the clinical evidence and the – and the results of clinical research, of in vitro research, of animal research, if you look at consensus documents, you'll see that there is great discussion concerning *the efficacy of glucosamine and chondroitin in the treatment of joint pain as well as osteoarthritis.*" Apatow Dep. at 171:12–22.

3

references to "Apatow Dep." are at Wade Decl. ¶3, Ex. 1). Apatow went on to deny that Supple had anything to do with arthritis, asserting instead that: "Supple is not marketed in a way that we would discuss symptoms or – or disease classes. Supple is marketed as a product that could help promote joint health." Apatow Dep. at 34:4–23, 120:10–121:18, 184:15–19.

This assertion—just like Defendant's advertising—could not be further from the truth. Indeed, all of Defendant's advertising—infomercials, websites, telemarketing campaigns and product labeling—expressly and impliedly makes the same claim: the fast-acting ingredients in Supple are "clinically proven effective" to treat and/or prevent the joint pain caused by arthritis. This material message—the only message—has remained consistent throughout the class period and across the various forms of media utilized in the marketing and advertising campaigns for Supple. Although Defendant has confusingly tried to deny that the Supple product is not targeting people with arthritis, the advertising speaks for itself, and so does Defendant.

**(1)   Defendant's Wildly Successful Infomercials Make False Promises Of A Cure For Arthritis And Joint Suffering**

Infomercials are the most effective form of advertising deployed by Defendant: nearly 90% of Defendant's $11 million in California sales are the result of consumers calling designated 800 numbers after viewing a Supple infomercial. *Id.* ¶4, Ex. 14. Of course, because there is a different 800 number associated with each airing of each infomercial, Defendant knows exactly how many people respond to each airing (and their identities and contact information), and can tailor the content and placement to maximize sales. *Id.* ¶3, Ex. 1 at 206:2 –207:20. Understanding the importance of Defendant's infomercials to its overall profitability, Apatow testified that television advertising is "the advertising that [he] hand-hold[s] to the end." *Id.* ¶3, Ex. 1 at 88:17–21.

Defendant's infomercials feature Apatow conversing with host, Dr. Monita Poudyal ("Poudyal") about the purported uses and benefits of Supple. It is never disclosed that Poudyal, who is portrayed as an independent medical expert, is, in

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

reality, Apatow's wife and a profits interest member of Supple, LLC.[3]  This, however, is only the tip of the iceberg with respect to the false and misleading nature of Defendant's infomercials.

As the infomercials open, no time is wasted clueing consumers in to the overarching message of the "Smart Medicine" show: "If you suffer from joint pain, arthritis, back pain, carpal tunnel, gout, fibromyalgia, or if you just want help losing weight, then this is a show you do not want to miss."[4]  *Id.* ¶16, Ex. 14. Along with the introduction, one of the following banners extolling Supple's ability to treat arthritis appears at the bottom of the screen and remains throughout the broadcast:






Wade Decl. ¶ 59.  Prompted by softball questions from his wife, Apatow goes on to claim Supple's "clinically proven" ingredients have "disease-modifying qualities," which he clarifies to mean "[d]isease-modifying for arthritis pain, it's something that

---

[3] *See* Dkt. No. 26-2 (Declaration Of Peter Apatow In Support of Defendants Response To The Courts Order To Show Cause Re: Subject Matter Jurisdiction).

[4] Curiously, although Apatow proudly boasts about Supple's ability to relieve "arthritis pain" in infomercials, he criticized an affiliate marketer for taking "creative license" and using the terms "pain," "arthritis," and "relieve arthritis pain," all of which he called unapproved terms. *See* Wade Decl. ¶15, Ex. 13.

completely reverses and halts the disease process." *Id.* ¶16, Ex. 14.  According to

Apatow, Supple "stops the vicious cycle of cartilage breakdown and degeneration"

and "rebuilds your joints… actually helps your joints heal," thereby offering

"permanent relief, never another day of pain swelling or immobility" in as little as 7

days.  *Id.*  Finally, Apatow closes on a more personal note, claiming that his arthritis

was healed just by drinking Supple: "I suffered from crippling arthritis pain for 20

years.  Today my life is completely different.  I have no more pain, no more

immobility, no more suffering at all and it's all because of Supple." *Id.*

Tellingly, Apatow—a  former accountant with no medical or scientific

background—promotes himself as an "Arthritis Survivor" and "Creator" of Supple.

*See id.* ¶21, Ex. 19 at SUP0005056; *see also id.*, ¶20, Ex. 18 at SUP0004958 ("I'm not

a doctor, who I am is a researcher and an arthritis survivor myself.").  Illustrating the

importance to Defendant of conveying the "arthritis can be cured" message, Apatow

insisted the term "arthritis survivor" be used in a Spanish translation version of the

infomercial, even after the translator expressed concern in using such a strong title for

Spanish translation.  *See id.* ¶12, Ex. 10 (2/8/12 email from Apatow instructing his

media company: "Arthritis survivor is an edgy concept that I am using that is being

used by some in the patient market as well. It is strong. Arthritis can kill. 16,500

people die every year from taking prescription pain drugs for arthritis. Countless more

die from over the counter pain drugs for arthritis. People die from joint replacements

—infections, blood clots. Most people don't consider this but people die trying to

manage their arthritis.").

There are four versions of the Supple infomercial that aired during the class

period, all make the same false claims targeting arthritis sufferers and promising a

quick and effective treatment, and all close with the same call to action:

> **If you're out there and you suffer from any type of arthritis,**
> **osteoarthritis, rheumatoid arthritis, gout, if you have joint pain**
> **and swelling and you tried everything and you're fed up, pick**
> **up the phone and call the number on the screen…it's a**

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

6

**delicious drink for complete joint pain relief that really works.**[5]

*Id.* ¶16, Ex. 14.  When unwary consumers do "pick up the phone" and call the designated 800 number, their calls are routed to a customer service call center and the telemarketers continue the false advertising campaign.  Apatow Dep. at 205:22–208:3.  Defendant provides the telemarketing companies with a lengthy and detailed script that instructs the operator to trumpet the alleged miraculous healing powers of Supple and to make every effort to up-sell the product.  *See id.* ¶52, Ex. 50 at SUP0001246 ("*Q: Can Supple help me if I have no cartilage left and there is bone on bone?* A: Yes, Supple can help comfort sore joints and improve overall joint function and range of motion.  Supple can also help repair and preserve remaining cartilage cells and can even help to generate new cartilage cells.").

     (2)    **Defendant controls its official and "affiliate" websites, which repeat the false promises of fast relief from arthritic joint pain**

     Another form of advertising utilized by Defendant is online advertising through the official Supple website, www.supplebodies.com, and other "affiliate" websites that make the same claims and offer to the sell the product.  Apatow Dep. at 88:23-92:5.  Although Defendant testified its online advertising is "continually in flux" and varies significantly over time, one need only look at Defendant's websites themselves to see the false efficacy and speed-of-action claims are virtually identical from one website to the next, (*see id.* ¶24, Ex. 22), and mirror the representations in the infomercials.  For example, the official website has a large picture of the Supple can, and in large

---

[5] Defendant's claim that Supple can provide complete relief from any type of arthritis borders on the absurd.  According to Defendant's own study: "as exemplified by the differences between hip and knee osteoarthritis, osteoarthritis is heterogenous—the symptoms, role of inflammation, and response to therapy depend on the affected joint groups."  Wade Decl. ¶32, Ex. 30 at SUP0000091.  To this end, there was enough of a difference between knee OA and hip OA that the European League Against Rheumatism published a separate set of detailed recommendations for the management of OA at each joint.  *See* Wade Decl. ¶33, Ex. 31 at SUP0004466.  Given that a single type of arthritis presents different symptoms and responds differently to treatment depending on the joint attacked by the disease, it is entirely implausible that Supple would treat all types of arthritis regardless of the joint groups affected.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1   letters states "THE ANSWER FOR JOINT PROBLEMS IN A DELICIOUS DRINK."

2   *Id.* ¶26, Ex. 24. Defendant's website also parrots the "clinically proven effective"

3   claim from the infomercials, and represents that "[n]othing is as proven, safe or

4   effective as the key ingredients in Supple to safely rebuild cartilage, reduce swelling,

5   and address the causes of joint suffering." *Id.* ¶24, Ex. 22. Finally, expressly

6   targeting arthritis sufferers as in the infomercials, Defendant's official website cross-

7   markets the book "Strong Women and Men Beat Arthritis," which allows consumers

8   to "learn cutting-edge, scientifically proven strategies for the relief of arthritis,

9   rheumatoid and osteoarthritis." *Id.* ¶26, Ex. 24.

10      The fact that Defendant's online advertising tracks the targeted message from

11  the infomercials is not surprising given that Apatow "developed the Supple

12  advertising [him]self," provides detailed guidelines to Defendant's marketing partners

13  and demands strict adherence, and even has a "full-time affiliate manager" tasked with

14  reviewing all affiliate marketing to make sure it is in line with Defendant's core

15  message.[6] Apatow Dep. at 87:11 – 88:6, 90:16 – 91:17, 105:20 – 106:5.

16      **(3)   Defendant's label makes false arthritis treatment claims and
            admittedly contains unapproved health claims in violation of
17           California law**

18  _____

    [6] Defendant's active, hands-on approach to policing the content of its websites and
19  affiliate marketing can be seen in a recent interaction with Infomercial TV ("ITV"),
    the company which formerly ran suppleonline.com and which handles affiliate
20  marketing for Defendant. Sarah Mills, an employee at ITV, sent an email directly to
    Apatow seeking approval for an affiliate marketer to post an article promoting Supple
21  on livingsmartandsocial.com. Wade Decl., ¶ 13, Ex. 11. After reviewing the post,
    Apatow stated: "This is absolutely not approved. It is not accurate, it uses unapproved
22  marketing terms such as joint pain, it is misleading, and it violates FDA law.
    Absolutely not. [¶] Affiliates have to strictly stay within our approved marketing
23  literature and CAN NOT change the language we use or statements we use to market
    supple. The irrelevant amount of potential sales that an affiliate can generate is not
24  worth a lawsuit or an FDA warning letter." *Id.* Apatow's statement that the term
    "joint pain" is misleading and violates the law is particularly interesting given that
25  Defendant's infomercials and websites prominently feature claims that Supple relieves
    "joint pain" and "joint suffering." *See* Wade Decl. ¶¶ 16-31, Exs. 14-29. As another
26  point of interest, it appears that Apatow is far less concerned with ensuring truthful
    advertising among affiliates when it begins to affect his bottom line. *See id.* ¶14, Ex.
27  12 (email chain between Apatow and Sarah Mills of ITV; after affiliates stopped
    advertising and sales volume decreased, Apatow instructed Mills to resume affiliate
28  marketing despite being told of risk that they might say something false and
    misleading like "cures arthritis!").

8

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Even the Supple labeling on the product itself falsely claims Supple can treat arthritis. Throughout the entirety of the class period, the labeling for Supple has prominently displayed the claim that Supple will "comfort, lubricate & rebuild your joints." Apatow Dep. at 130:25 – 132:5.  In responding to Plaintiff's CLRA letter, Defendant explained the intended meaning of the terms "comfort and lubricate" and "rebuild joints": "*Numerous scientific studies and clinical data support the fact that glucosamine and chondroitin can alleviate the symptoms ('comfort and lubricate) of osteoarthritis ('OA') and also provide structure modification ('rebuild joints') to alter the course of the disease*." Wade Decl. ¶58, Ex. 56 (emphasis added).  This explanation, which was included under the heading "The Supple Beverage Effectively Treats Osteoarthritis," stands as a clear admission that Supple's labeling claims refer to the signs and symptoms of a disease, namely arthritis, and implies that it has an effect on the disease.

Although Supple is a "direct-to-consumer" product, meaning it is not sold at retail and is only sold over the telephone or the internet directly by Defendant, all class members are exposed to the labeling in the same way all are exposed to the advertising prior to purchase. This is because images of the Supple product itself appear on the infomercials and are all over the Supple websites, and most customers purchase the product multiple times and are exposed to the label over and over again as a result of being enrolled (unwillingly) in the "auto-ship" program or because the "instructions" shipped with the product direct consumers to drink it every day forever to realize results. *Id.* ¶53, Ex. 51.

**C.   Glucosamine And Chondroitin Supplementation – A Controversial And Unproven Therapy For Arthritis**

Supple is a true "credence" good in that consumers only know of the purported benefits of the product from the aforementioned infomercials, websites and labeling, and must take it "on faith" that Defendant is telling the truth.[7]  Understanding this fact

---

[7] *See* Richard A. Posner, *An Economic Approach to the Law of Evidence*, 51 Stan.L.Rev. 1477, 1489 (1999) ("A good is a credence good if the consumer cannot readily determine its quality by inspection or even use, so that he has to take its

all too clearly, Defendant has developed a fairly simple scheme to drive sales of Supple: highlight a few outlandish efficacy claims and present consumers with a large dump of studies in the hopes that they will be overwhelmed by the purported "clinical proof" and will *not* question the science. But, as set forth in detail below, Defendant's own documents confirm that evidence common to all class members prove Supple *cannot* treat arthritis and relieve joint pain, that Supple's key ingredients are *not* "clinically proven effective" and that Supple is *not* fast-acting.

It is also important to note Defendant produced 292 studies (in response to document requests asking for any substantiation or support for its claims about the product), and *every single study* produced is regarding the use of chondroitin and/or glucosamine for the treatment of arthritis. *See id.* at ¶55. In fact, the *only* reason chondroitin and glucosamine have ever even been studied is to determine what effect, if any, these compounds have on arthritis. Thus, to the extent there was any question as to whether any of Defendant's advertising is about arthritis (as Defendant tried to deny during the 30(b)(6) deposition), the fact that all purported substantiation for the claims about Supple concern arthritis treatment provides the obvious answer.

Moreover, Defendant's production of and reliance on this "science" demonstrates that Defendant's claims about Supple can be evaluated on a class-wide basis, as even Defendant concedes. *See id.* ¶4, Ex. 2 (Mr. Apatow's "Depo Notes" listing studies Defendant contends support its claims.).

**(1) The "consensus" among the scientific community is that glucosamine hydrochloride is no more effective than placebo**

Defendant claims the common evidence it provided during discovery "clearly supports [Defendant's] claims," and is "representative of the collective, general consensus opinions of glucosamine and chondroitin." Apatow Dep. at 244:4-19. Conversely, however, according to the scientific literature ***Defendant produced*** as purported support for its claims, "***[t]here appears to be consensus that GlcN.HCl [glucosamine hydrochloride] lacks efficacy for the palliation of pain or function in*** quality 'on faith.'").

MOTION FOR CLASS CERTIFICATION

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

*OA [osteoarthritis]."*[8]  This "consensus" is reiterated throughout the scientific literature regarding GH, including a number of other studies produced by Defendant in this litigation, all of which is common evidence.[9]

Brazenly ignoring the "consensus" among researchers that GH is ineffective, Defendant asserts its bold marketing and advertising claims are supported by a "wealth of scientific data" regarding crystalline glucosamine sulfate ("CGS"), an ingredient not found in Supple (and in fact, a compound Apatow testified he had "heard of" but knew nothing about).[10]  Apatow Dep. at 69:5 – 70:8.  According to Defendant, there is no difference between the various formulations of glucosamine, and studies utilizing one formulation are equally applicable to the others.  Apatow Dep. at 65:1-21, 68:1 – 70:8, 72:24 – 73:17.  But again, as common evidence produced by Defendant in this litigation demonstrates, there is now widespread

---

[8] Wade Decl. ¶ 34, Ex. 32 at SUP0004435 ("Several well-performed meta-analyses have been performed in the last decade, andtwo recent yet contradictory publications are representative. Interestingly, they agree that preparations of GlcN crystallized as the hydrochloride salt are ineffective, but disagree over the therapeutic benefit of GlcN preparations crystallized as the sulfate salt.").

[9] *See* Wade Decl. ¶ 33, Ex. 31 at SUP0004471 ("[T]wo of the major published guidelines recommended glucosamine sulfate in the treatment of OA pain while another integrating more recent data did not consider glucosamine sulfate.  At this time, glucosamine hydrochloride cannot be recommended based on the available clinical data."); *id.* ¶ 35, Ex. 33 at SUP0004413 ("In other pharmaceutical-grade products, glucosamine is supplied as hydrochloride, that is, a more readily available and easier to manufacture salt that is also present in several dietary supplements available in the markets around the world.  This salt is often supplied in combination with chondroitin sulfate (CS) and has not proven effective in several trials.").

[10] Defendant does not dispute that CGS is not a Supple ingredient. Apatow Dep. at 68:11 – 69:4. While CGS has produced positive results in industry-funded trials, these results have not been replicated using dietary supplement grade GH or glucosamine sulfate ("GS").  The only large-scale, methodologically sound studies to use GH demonstrated that it is no more effective than placebo.  *See* Wade Decl., ¶¶ 36-37, Exs. 34-35; *see also id.* ¶ 41 , Ex. 39 at SUP0004066 ("Trials using glucosamine hydrochloride had a very small summary effect size that was statistically indistinguishable from the null.  The finding that heterogeneity among these trials was absent suggests that this summary effect is valid.  Therefore, we conclude that glucosamine hydrochloride has no effect on pain and that future studies of this preparation are unlikely to yield useful results."); *id.* ¶ 42 , Ex. 40 at SUP0004638 ("The best available evidence found that glucosamine hydrochloride, chondroitin sulfate, or their combination provide no clinical benefit in patients with primary OA of the knee.").  Additionally, recent, high-quality studies of dietary supplement grade GS have uniformly concluded that the formulation is no more effective than placebo in dealing with the causes and symptoms of joint pain.  *See* Wade Decl, ¶¶38-40, Exs. 36-38.

11

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1    agreement in the scientific community that the efficacy and safety data obtained using

2    CGS cannot be extrapolated to dietary supplement GH and GS available in the US.[11]

3    **(2) Recent evidence undermines the effectiveness of chondroitin sulfate**

4    As with GH, Defendant blatantly misrepresents the science backing its other

---

[11] *See* Wade Decl. ¶ 35, Ex. 33 at SUP0004422 ("Crystalline glucosamine sulfate is the only pharmaceutical product that has demonstrated consistently that it is effective against the symptoms and progression of knee osteoarthritis…. Glucosamine hydrochloride and other glucosamine sulfate preparations have produced inconsistent clinical efficacy results, probably owing to different pharmacokinetics, suboptimal dosing schedule, study design and, in some studies, quality of the products…. Future studies should directly compare the pharmacokinetics and therapeutic effects of glucosamine hydrochloride or other glucosamine sulfate preparations with the reference crystalline glucosamine sulfate product and regimen in suitably designed, placebo-controlled trials in OA patients, before the former are further used to assess the role of glucosamine in OA since their results may be misleading."); *id.* ¶43 , Ex. 41 at SUP0003760 ("[The Rotta preparation of crystalline glucosamine sulfate] has shown positive effects on symptomatic and structural outcomes of knee OA. These results should not be extrapolated to other glucosamine salts (hydrochloride or preparations (over-the-counter or food supplements)) in which no warranty exists about content, pharmacokinetics and pharmacodynamics of the tablets."); *id.* ¶44, Ex. 42 at SUP0000411 ("Differences in the clinical effects with generic or dietary supplement glucosamine hydrochloride formulations may indeed by related to differences in dose regimens and in pharmacokinetics, which may lead to differences in the pharmacological properties. In addition, the presence of sulfates in the prescription drug formulation [crystalline glucosamine sulfate], which is stabilized according to a patented process, has also been suggested to be important from the point of view of favoring some of the compound pharmaco-metabolic characteristics, which might not be shared by glucosamine hydrochloride. Conversely, preparations of glucosamine sulfate, other than the prescription formulation, manifest differences in quality and dose regimens that would require appropriate pharmacokinetic and bioequivalence assessment. Since this is not currently available, it is impossible to apply the efficacy and safety results obtained with crystalline glucosamine sulfate to these other preparations and *vice versa*[.]"); *id.* ¶45, Ex. 43 at SUP0001026 ("[N]ot all outcomes and not all RCTs [randomized controlled tests] demonstrated a consistent superiority of glucosamien over placebo…. Therefore, the results in favor of glucosamine are mixed, and further research is still needed to clarify the true efficacy of glucosamine in OA. [¶] Subgroup analyses of the Rotta preparation [crystalline glucosamine sulfate] showed significant benefit over placebo in terms of pain and in the outcomes of the Lequesne index as well as in the WOMAC pain and function scores. For non-Rotta preparations, the pooled results show that there was no statistically significant difference in terms of pain and WOMAC pain, stiffness and function scores."); *id.* ¶46, Ex. 44 at at 1047 ("Transfer of the efficacy and safety data obtained with [crystalline glucosamine sulfate] to common dietary supplements, has already been discouraged. In fact, these uncontrolled formulations often have a much lower glucosamine content than reported in their label claims and are thus commonly underdosed. In addition, there is currently no clinical justification to use different glucosamine compounds or even glucosamine salts, e.g., hydrochloride, as pivotal trials failed to show the same benefit."); *id.* ¶47, Ex. 45 ("In this study, [crystalline glucosamine sulfate] was approved as a prescription drug, therefore, our results cannot be generalised to other glucosamine products (or compound mixtures) such as those available in some countries as dietary supplements.").

12

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1    key ingredient, chondroitin sulfate ("CS"). Indeed, as the authors of one of

2    Defendant's own studies recently wrote: "Efficacy of chondroitin sulfate over placebo

3    for treating pain in OA was reported in many of the smaller, earlier studies, but the

4    estimates varied considerably from study to study. In recent years, larger-scale trials

5    have reported little to no effect of chondroitin sulfate treatment on the symptoms of

6    OA."[12] Moreover, studies have shown that combined dosing of CS and GH, as in

7    Supple, *actually reduces the absorption of GH*.[13] This common evidence casts further

8    doubt on the purported efficacy of Supple.

9           **(3)    Even assuming glucosamine and/or chondroitin had any effect on
                    joint pain and suffering (which they do not), research indicates the
                    effect would be "slow-acting"**

10          A review of the scientific and medical literature reveals that there is nothing in

11   the body of scientific research on GH and/or CS that supports Defendant's "fast-

12   acting" claims. Much to the contrary, these compounds are specifically designated as

13   "slow acting" by common evidence produced by Defendant.[14] Even pharmaceutical

14

15   _____

16   [12] Wade Decl. ¶48, Ex. 46 at SUP0003627 – SUP0003628; *id.* ¶55, Ex. 53 at
     SUP0003780 ("No robust evidence supports the use of chondroitin in osteoarthritis.

17   Large-scale, methodologically sound trials indicate that the symptomatic benefit is
     minimal to nonexistent. The effect of chondroitin on joint space narrowing was

18   assessed in only a few trials. This effect is likely to be small, and its clinical
     significance is uncertain. In patients with low-grade osteoarthritis, the use of

19   chondroitin should be restricted to randomized, controlled trials. For patients with
     advanced osteoarthritis, a clinically relevant benefit is unlikely and the use of

20   chondroitin should be discouraged."); *id.* ¶36, Ex. 34 (finding that CS, whether alone
     or in combination with GH, is no more effective than placebo in relieving the pain and

21   immobility associated with knee osteoarthritis); *id* ¶ 56, Ex. 54 at SUP0000666 ("In
     the present study [to determine whether chondroitin sulfate is effective in inhibiting

22   cartilage loss in knee osteoarthritis], there was no appreciable change in pain,
     stiffness, and function over 2 years…. While no significant symptomatic effect was

23   found in this first randomized, double-blind, placebo-controlled study, CS may be
     able to halt structural changes in OA of the knee over 2 years. Further research is

24   needed to determine whether this translates into clinically relevant gains in
     arthroplasty rates, decreased long-term disability, and reduced resource utilization.");

25   *id.* ¶57, Ex. 55 at SUP0000604 ("The actual application of chondroitin sulfate for
     clinical practice of OA still needs more time, and there is no sufficient evidence to

26   confirm whether the combination of glucosamine and chondroitin sulfate is more
     effective than a single administration.").

27   [13] Wade Decl. ¶49, Ex. 47 at SUP0003460.
     [14] *See* Wade Decl. ¶50, Ex. 48 at SUP0000520 ("SYSADOA is a generic term used

28   for symptomatic slow acting drugs for OA, and includes glucosamine sulphate and
     related compounds, chondroitin sulfate, and diacerein.").

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

grade CGS (which Defendant uses as "support" for its marketing and advertising claims) is not considered fast-acting.[15]

## III.   PROPOSED CLASS DEFINITION

Plaintiff seeks to certify the following California class pursuant to Rules 23(a) and 23(b)(3): "All persons residing in the State of California who purchased Supple for personal use and not for resale since December 2, 2007."

Excluded from the class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns, as well as any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

## IV.   THE PROPOSED CLASS EASILY MEETS THE REQUIREMENTS FOR CLASS CERTIFICATION

"[F]raud perpetrated on numerous persons by the use of similar misrepresentations" is particularly suited for class treatment. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 624 (1997). Accordingly, where, as here, a class action alleges violations of California's consumer protection statutes on the basis of uniform, material misrepresentations made to all class members, certification is routinely granted.[16]

---

[15] *See* Wade Decl. ¶44 Ex. 42 at SUP0000404 ("[Crystalline] Glucosamine sulfate should not be regarded as a drug for short-term symptom relief, but one for osteoarthritis disease management. This includes symptom modification over appropriate treatment durations, specifically at least 6 months according to current regulatory guidelines, and possibly long-term trials for both joint structure modification and symptom modification (i.e., true disease modification).").

[16] *See, e.g. Johnson v. Gen Mills, Inc.*, 275 F.R.D. 282, 286 (C.D. Cal. 2011) (certifying consumer class action alleging manufacturer violated the UCL and CLRA by falsely representing that its yogurt products promoted digestive health); *Bruno v. Quten Research Institute, LLC*, 280 F.R.D. 524, 540 (C.D. Cal. 2011) (certifying consumer class action alleging manufacturer violated, inter alia, UCL, FAL, and CLRA by falsely representing its liquid dietary supplement had "6X" absorption and effectiveness than equivalent enzyme in competing brands); *Mathias v. Smoking Everywhere, Inc.*, 2011 WL 502454, at *3 (E.D. Cal. Oct. 20, 2011) (certifying consumer class action alleging Defendant misrepresented that electronic cigarettes were a safe alternative to traditional cigarettes); *In re Brazilian Blowout Litigation*, CV 10-8452-JFW (MANx) (C.D. Cal. April 12, 2011) (order certifying nationwide class of purchasers of Defendant's Brazilian Blowout products alleging Defendant

14

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

1    Plaintiff bears the burden of demonstrating that "each of the four requirements

2    of Rule 23(a) and at least one of the requirements of Rule 23(b)" are met.  *Zinser v.*

3    *Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  This proposed class

4    action squarely meets the criteria of Rule 23(a)(1) to (4) of the Federal Rules of Civil

5    Procedure and is maintainable under the Rule 23(b)(3) factors.

6    **A.     This Action Satisfies The Requirements Of Rule 23(a)**

7    Commonly referred to as the numerosity, commonality, typicality and adequacy

8    requirements, *see Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019 (9th Cir. 1998),

9    under Rule 23(a), a district court may certify a class if: "(1) the class is so numerous

10    that joinder of all members is impracticable, (2) there are questions of law or fact

11    common to the class, (3) the claims or defenses of the representative parties are

12    typical of the claims or defenses of the class, and (4) the representative parties will

13    fairly and adequately protect the interests of the class."[17]  Fed. R. Civ. P. 23(a).

14    **1.     Numerosity Is Undisputed**

15    Defendant has conceded that it "does not contest numerosity."  Wade Decl. at

16    ¶54, Ex. 52.   Thus, for purposes of this motion, numerosity is not in dispute.

17    **2.     Commonality Is Established Because This Case Is About A Common Advertising Campaign Which Gives Rise To Common Questions Subject To Common Proof**

18    
19    Rule 23(a)(2) requires a plaintiff to identify questions of law and fact common

20    to the class showing that "the class members 'have suffered the same injury.'"  *Wal-*

21    *Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2451, 2551 (2011).  In other words, the class

22    members' claims "must depend on a common contention… [which] must be of such a

23    
misrepresented that its products were "formaldehyde free" and "100% salon safe" in
violation of the UCL and FAL).

[17] Although not referenced in Rule 23(a), "there is an additional prerequisite to
certification—that the class be ascertainable."  *Keegan v. Amer. Honda Motor Co.,
Inc.*, 2012 WL 2250040, at *10 (C.D. Cal. June 12, 2012).  "A class is sufficiently
defined and ascertainable if it is 'administratively feasible for the court to determine
whether a particular individual is a member.'"  *Id.* at *11.  Here, Plaintiff's proposed
class definition is based entirely on objective criteria verifiable through documentation
of a purchase of Supple.  Moreover, because all of Defendant's sales are direct-to-
consumer, Defendant has records of every purchase which can be used to easily
identify all class members.  Accordingly, there is no question that the proposed class
is ascertainable.  *Id.*

15

1   nature that it is capable of classwide resolution—which means the determination of its

2   truth or falsity will resolve an issue that is central to the validity of each one of the

3   claims in one stroke." *Id.* Although for purposes of Rule 23(a)(2) even a single

4   common question will do, *see id.*, "[w]hat matters to class certification… is not the

5   raising of common 'questions' – even in droves – but, rather the capacity of a

6   classwide proceeding to generate common answers apt to drive the resolution of the

7   litigation." *Id.*

8         The overriding common questions in this case are whether Defendant

9   misrepresented that Supple can treat arthritic joint pain and whether this

10  misrepresentation is likely to deceive a reasonable consumer. These straightforward

11  questions are binary: either the advertising is misleading or not, and the efficacy and

12  speed-of-action claims are either true or false.

13        The aforementioned common questions will generate common answers which

14  will drive the litigation. Indeed, substantial evidence demonstrates that Defendant

15  disseminated its marketing and advertising regarding the purported uses and benefits

16  of Supple uniformly and pervasively during the class period. *See* Section II, *supra*.

17  Whether such marketing is likely to mislead a reasonable consumer can be determined

18  on a class-wide basis. *See  Johnson v. Gen Mills, Inc.*, 275 F.R.D. 282, 286 (C.D. Cal.

19  2011) (certifying class and holding plaintiff's "UCL and CLRA claims raise common

20  issues regarding General Mills allegedly deceptive representation that YoPlus

21  promotes digestive health".). Further, whether Class members have been damaged,

22  and, if so, the measure of those damages can easily be determined on an aggregate

23  basis from Defendant's records. This common evidence will enable the Court to

24  determine Defendant's liability for violations of California law on a class-wide basis.

25        In sum, Plaintiff's claims depend upon common contentions that are capable of

26  classwide resolution. Determination as to whether Defendant's claims are false and

27  misleading will resolve the case. *Wal-Mart*, 131 S.Ct. at 2551.

28

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

MOTION FOR CLASS CERTIFICATION

### 3. Typicality Is Established Because Plaintiff's Claims Are Based On The Same Conduct And The Same Injury As The Class

"The typicality prerequisite of Rule 23(a) is fulfilled if 'the claims or defenses of the representative parties are typical of the claims or defenses of the class.'" *Hanlon*, 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(3)). Under Rule 23(a)'s "permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 140 F.3d at 1020; *see also Gen. Tel. Co. of Southwest v. Falcon*, 457 U.S. 147, 157 (1982). The test of typicality "is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).

Rule 23(a)(3)'s typicality requirement seeks to determine "whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Falcon*, 457 U.S. at 157. As such, "[t]he purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Hanon*, 976 F.2d at 508.

Here, Plaintiff Arlene Cabral's claims are identical those of the proposed Class, as all of the claims in the instant litigation stem from the same set of misrepresentations, consistent across Defendant's various forms of marketing and advertising, to which all purchasers of Supple were exposed. Plaintiff purchased and consumed Supple believing that it would effectively treat her arthritis. Cabral Decl. at ¶4. If Plaintiff had known that Supple's key ingredients are *not* "fast-acting," are *not* "clinically proven effective," and have no ability to treat and/or prevent arthritis, she would not have purchased the product. *Id.* at ¶8. As such, Plaintiff's claims pose the same questions of law and fact as the Class members, and arise from the same marketing, advertising, and labeling claims that give rise to other Class members' claims. Plaintiff also suffered the same injury as other members of the Class–the loss

17

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

of the purchase price paid for Supple (including shipping costs), which is worthless because it does not possess any of the uses and benefits touted in Defendant's marketing and advertising–and seeks an injunction on behalf of all Class Members. *Id.* Thus, Plaintiff clearly meets the typicality requirement, and is well-suited to represent the Class.

### 4. Adequacy Of Representation Is Satisfied By Plaintiff And Her Counsel

"The final hurdle interposed by Rule 23(a) is that 'the representative parties will fairly and adequately protect the interests of the class.'" *Hanlon*, 150 F.3d at 1020 (quoting Fed. R. Civ. P. 23(a)(4)). "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class*?" Id.*; *see also Crawford v. Honig*, 37 F.3d 485, 487 (9th Cir. 1994).

#### a. Neither Plaintiff Nor Her Counsel Have Any Conflict Of Interest With The Proposed Class

The class representatives may not have interests antagonistic to the remainder of the class. *Lerwill*, 582 F.2d at 512. Here, Plaintiff's claims arise from the same uniform statements and standardized conduct of Defendant as the Class, and Plaintiff seeks remedies equally applicable and beneficial to the Class. Moreover, Plaintiff's counsel do not have any conflict of interest with the proposed class. Wade Decl. ¶66.

#### b. Plaintiff And Her Counsel Will Prosecute This Action Vigorously

##### i. Plaintiff Cabral is an adequate class representative

The general rule is that an adequate class representative need only have personal experience with the claims of the lawsuit and a general familiarity with the facts, but not necessarily a clear recollection of all facts relevant to their claims. *See, e.g.*, *Jimenez v. Domino's Pizza, Inc.*, 238 F.R.D. 241, 249 (C.D. Cal. 2006).

Here, Plaintiff has personal experience with the claims of the lawsuit and is quite familiar with the underlying facts. *See* Cabral Decl. at ¶¶2-8, 10. In reliance on the false and misleading statements that Supple's key ingredients are fast-acting,

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

capable of, and "clinically proven effective" to treat and/or prevent arthritis, Plaintiff purchased and consumed Supple. *Id.* at ¶4. Had Plaintiff been aware that these claims are false and Supple has no ability to treat and/or prevent arthritis and joint pain, she would not have purchased the product. *Id.* at ¶ 8. Plaintiff Cabral has no conflicts with any member of the proposed class, and will actively monitor and control this litigation and protect the interests of the class. *See id.* at ¶9.

ii. **Plaintiff's counsel are qualified, experienced and have the resources to vigorously prosecute this action**

In considering the requirement that Plaintiff is represented by qualified and competent counsel, "the Court will look to the professional qualifications, skills, experience and resources of the lawyers." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 650 (C.D. Cal. 1996).

As set forth fully in the declaration of Gillian L. Wade, Milstein Adelman, LLP ("MA") are highly capable and experienced counsel. Plaintiff's counsel have successfully prosecuted numerous class action cases; they are capable of, and committed to, prosecuting this action vigorously on behalf of the class. *See* Wade Decl. at ¶¶59-64. Accordingly, Plaintiff's counsel satisfies the adequacy requirement.

**B.    The Court Should Certify a Rule 23(b)(3) Class**

In addition to the prerequisites set forth in Rule 23(a), a class must also be maintainable under Rule 23(b). *See Weiner v. Dannon Co., Inc.*, 255 F.R.D. 658, 668 (C.D. Cal. 2009). Class certification pursuant to Rule 23(b)(3) requires that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3). "Certification under Rule 23(b)(3) is proper 'whenever the actual interests of the parties can be served best by settling their differences in a single action." *Negrete v. Allianz Life Ins. Co. of N. Am.*, 238 F.R.D. 482, 489 (C.D. Cal. 2006).

19

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

### 1.    Common Issues Predominate Over Individual Issues

A plaintiff satisfies Rule 23(b)(3) when questions of law and fact common to all class members predominate over questions affecting only individual members. *See* Fed. R. Civ. P. 23(b)(3). "When common issues present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is a clear justification for handling the dispute on a representative rather than on an individual basis." *Hanlon*, 150 F.3d at 1022.

Questions of law and fact common to all members of Plaintiff's proposed class are central to this litigation, which is about a common advertising campaign conveying <u>one</u> message that every class member was exposed to, about a product that has only <u>one</u> purpose. These common questions predominate over any individual issues Defendant may identify or assert. Indeed, liability pursuant to California's UCL, FAL, and CLRA all require a determination of whether the reasonable consumer is likely to be deceived, not whether any individual was actually deceived—a common issue that does not require individualized inquiry.[18] Moreover, in the same way Plaintiff can establish liability by common evidence demonstrating that Defendant's efficacy and speed-of-action claims are false, deceptive and uniformly disseminated, Defendant can defend itself with common evidence to the contrary. *See Johnson*, 275 F.R.D. at 289 ("General Mills could defeat the claims of the entire class by proving YoPlus promotes digestive health in the manner that General Mills allegedly represented. The digestive health benefit of YoPlus, or the lack thereof, is a common issue that is particularly appropriate for class wide resolution because it will turn on complex and expensive scientific evidence and expert testimony."). As such,

---

[18] *See Johnson*, 275 F.R.D. at 288-89 ("General Mill's argument is unpersuasive that individual issues predominate because purchasers of YoPlus have been exposed to different mixes of packages and advertisements since General Mills has, over time, modified the packaging of YoPlus and the content and emphasis of its marketing materials. Contrary to General Mills' suggestion, individualized proof of deception and reliance are not necessary for [plaintiff] to prevail on the class claims…. The common issue that predominates is whether General Mills' packaging and marketing communicated a persistent and material message that YoPlus promotes digestive health.").

MOTION FOR CLASS CERTIFICATION

common questions of law and fact predominate over any alleged individual issues in this matter.

### a.    Plaintiff's UCL and FAL Claims Will Be Established Through Classwide Proof

Common issues of fact and law predominate as to Plaintiff's claims under the UCL and FAL.  *See In re Tobacco II*, 46 Cal.4th 298, 312 n.8 (2009) ("A violation of the UCL's fraud prong is also a violation of the false advertising law.").  When Plaintiff and members of the class are exposed to a common advertising campaign, common issues predominate. [19]  Even though Defendant advertised Supple through various media (including product labeling, television and internet advertising), the marketing communicated a persistent and material message that Supple can relieve joint pain for arthritis sufferers.  Each and every class member who purchased Supple was thus exposed to a single, uniform message regarding the uses and benefits of the product.  Accordingly, the determination of Defendant's liability under both statutes presents a singular legal issue that is common to the class a whole:  whether "members of the public are likely to be deceived" by claims that Supple is capable of treating arthritis with its fast-acting and "clinically proven effective" ingredients.

Claims under the UCL are particularly appropriate for class certification because the ***UCL focuses on the defendant's conduct*** and not the plaintiff's damages (and individualized proof of deception, reliance and injury are not required).  *Id.* at 324; *eee also In re Abbott Laboratories Norvir Antitrust Litig*., No. C 04-1511 CW, 2007 WL 1689899, at *10 (N.D. Cal. June 11, 2007) ("[C]laims brought under the California Unfair Competition Law are commonly certified for class treatment.").  To this end, whether conduct or advertising is "misleading" under the UCL and FAL is

---

[19] *See, e.g.*, *In re Ferrero Litig.*, No. 11-205, 2011 U.S. Dist. LEXIS 131533, at *16- *17 (S.D. Cal. Nov. 15, 2011) (predominance satisfied whether class members had "common contention" that Defendant "made material misrepresentation regarding the nutritious benefits of Nutella that violated the UCL, FAL, and the CLRA" and "any injury suffered by a class member stems from Defendant's common advertising campaign of Nutella"); *Wiener*, 255 F.R.D. at 669-670 (predominance satisfied where Defendant's health benefit claims were "explicitly and continually" presented through various mediums, including product labels and television, print and internet advertising)

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

21

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

determined by a "reasonable consumer" standard. *Lavie v. Procter & Gamble Co.,* 105 Cal.App.4th 496, 509-10 (2003). Through, *inter alia*, expert testimony and scientific literature and testing—all of which will demonstrate conclusively that Defendant's key ingredients are not effective in treating and/or preventing arthritis— Plaintiff will present "generalized evidence" proving Defendant's bold marketing and advertising claims are likely to deceive reasonable consumers, and are, in fact, false. Thus, the sole merits based factual question at trial will be whether Defendant's uniform advertising campaign was "likely to deceive" the proposed class.

### b.    Plaintiff's CLRA Claim Raises Common Questions

Likewise, Plaintiff's CLRA claim raises common questions that will be answered using common evidence. Plaintiff must ultimately establish three elements under the CLRA: (1) Defendant's conduct was deceptive; (2) causation; and (3) damages. *See Mass. Mutual Life Ins. Co. v. Sup. Ct.*, 97 Cal.App.4th 1282, 1292 (2002). Proving Defendant's conduct is deceptive rests on common proof because the Supple marketing and advertising conveys a uniform, material message which is the foundation of Defendant's infomercials, websites, and product labeling. The inquiry focuses on *Defendant's* conduct and *Defendant's* common misrepresentations, and to establish a violation of the CLRA, the Class will establish through common evidence that Supple's key ingredients—glucosamine hydrochloride and chondroitin sulfate— are no more effective than placebo in treating and/or preventing the causes and symptoms of arthritis (and, thus, that Supple does not have the "characteristics, uses, benefits, or qualities" as advertised by Defendant).

The CLRA's causation element also favors class certification. "[C]ausation, on a classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises to the class." *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011) (emphasis in original); *see also Wiener,* 255 F.R.D. at 669; *Occidental Land, Inc. v. Sup. Ct.*, 18 Cal.3d 355, 363 (1976). Whether a misrepresentation is

material is a fact-intensive question that asks whether "a reasonable man would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *In re Steroid Hormone Product Cases*, 181 Cal.App.4th 145, 157 (2010). Thus, at certification, Plaintiff need only present evidence that Defendant made uniform, material misrepresentations to the class as a whole. *See Mass. Mutual Life Ins. Co.*, 97 Cal.App.4th at 1292.

In purchasing Supple, each and every class member was necessarily exposed to Defendant's marketing and advertising, which, throughout the entirety of the class period, consisted of a uniform, material message that Supple quickly and effectively relieves arthritic joint pain and suffering. *See* Section II, *supra*. Defendant cannot dispute the materiality of this message, as there is only one reason a consumer would purchase Defendant's product and only one reason the product is sold—namely, to relieve the suffering and immobility associated with their arthritis.[20] Thus, because each class member was exposed to the same material misrepresentations, a presumption of reliance is appropriate, and causation can be determined on the basis of common proof. *See Stearns*, 655 F.3d at 1022; *Wiener*, 255 F.R.D. at 669.

Moreover, the damages suffered by members of the class are simple to calculate—essentially the purchase price of Supple multiplied by the number of units purchased.[21] Moreover, because Supple is not available at retail and all of Defendant's sales are direct-to-consumer, Defendant has a record of every purchase and can easily determine the refund amount owed to each class member.

---

[20] In the past, Defendant has claimed that Supple "helps you lose weight." However, Defendant admitted in a pre-filing communication that it "removed all references to weight loss from all of its websites years ago….. There will be no references to weight loss in Supple's new advertising." Wade Decl. ¶51, Ex. 49. As such, Defendant cannot argue that "weight loss" (or anything else for that matter) is an alternate reason someone might purchase Supple.

[21] At his deposition, Apatow produced documentation indicating that $1,150,000 in chargebacks and refunds had been provided to California consumers during the class period. Wade Decl. ¶4, Ex. 2 at 25. Although this may affect the calculation of restitution for a small portion of the class, even class members who received a full refund are class members entitled to restitution in the form of processing and handling charges, damages and penalties under the CLRA, and injunctive relief.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

23

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

Finally, common evidence will demonstrate that Plaintiff and members of the Class are entitled to statutory penalties under the CLRA because Defendant targets disabled consumers.  The focus of disabled persons penalty is on Defendant's conduct, and a violation can be established by demonstrating that, in violating the CLRA, Defendant "knew or should have known that its conduct was directed to one or more… disabled persons."  *See* Cal. Civ. Code §§ 1780(b)(1)(B), 3345(b)(1). Moreover, whether members of the class "ha[ve] suffered substantial… economic damage resulting from defendant's conduct," Cal. Civ. Code § 1780(b)(1), will be established by common evidence of the high cost of Supple, an issue recognized by Defendant. Apatow Dep. at 250:15-24.  Given that arthritis is the largest cause of disability in the United States and Supple is marketed and sold to persons who have arthritis, adjudication of Defendants' liability for statutory penalties will not require an individualized inquiry as to each class member.

## 2.    A Class Action is the Superior Method of Adjudication

A class action must be "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R. Civ. P. 23(b)(3).  In evaluating whether a class action is the superior method of adjudicating the issues in the litigation, the Court looks to four factors: "(1) the interest of each class member in individually controlling the prosecution or defense of separate actions; (2) the extent and nature of any litigation concerning the controversy already commenced by or against the class; (3) the desirability of concentrating the litigation of the claims in a particular forum; and (4) the difficulties likely to be encountered in the management of a class action."  *Keegan v. Amer. Honda Motor Co., Inc.*, 2012 WL 2250040, at *41 (C.D. Cal. June 12, 2012).

Where, as here, the "damages suffered by each putative class member are not large, [the first factor enumerated in Rule 23(b)(3)] weighs in favor of certifying a class action." *Zinser*, 253 F.3d at 1190.  Indeed, if potential class members were forced to pursue their claims individually, a number of disadvantages would arise,

including "less litigation or settlement leverage, significantly reduced resources and no greater prospect for recovery." *See Hanlon*, 150 F.3d at 1023.   Moreover, the "great expense that would fall on individual class members if each class member had to provide scientific evidence and expert testimony in separate cases" significantly favors certification. *Johnson*, 275 F.RD. at 289.

Further, given that there are no other cases challenging Defendant's marketing and advertising claims under California's consumer protection statues, there is no "threat of multiplicity" or "risk of inconsistent adjudications" in proceeding as a class action. *See Zinser*, 253 F.3d at 1191.   Accordingly, the second factor—the extent and nature of any litigation concerning the controversy already commenced by or against the class—also favors certification. *See id.*   With regard to the third factor, because the proposed class involves only California purchasers of Supple, it is appropriate to concentrate the litigation in this Court. *See* Fed. R. Civ. P. 23(b)(3)(C).

Finally, this case does not present the type of "complexities of class action treatment [that would] outweigh the benefits of considering common issues in one trial." *Id.* at 1234-35.   First, in contrast to other matters where individual class members must "litigate numerous and substantial separate issues to establish [their] right to recovery," *Zinser*, 253 F.3d at 1192, here, resolution of the predominate legal issues will be driven by a common core of salient facts—i.e. each class member's exposure to Defendant's uniform marketing and advertising claims—and the presentation of common scientific evidence regarding the lack of efficacy of glucosamine and chondroitin sulfate.   Moreover, unlike in multi-state class actions, here the Court will apply California law uniformly to all claims.   Accordingly, manageability issues are not likely to arise (*see* Fed. R. Civ. P. 23(b)(3)(D)) and a class action is superior to individual suits regarding the issues at bar.

## V.   <u>CONCLUSION</u>

For the reasons stated herein, Plaintiff, on behalf of herself and the proposed class, requests the Court issue an order granting this motion for class certification.

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

25

1    DATED: July 17, 2012                    Attorneys for Plaintiff,
2                                            Arlene Cabral and the Proposed Class
3
4
5                                            By:  /s/ Gillian L. Wade_____
6                                                 MILSTEIN ADELMAN, LLP
                                                  Gillian L. Wade
7                                                 M. Isaac Miller
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Milstein Adelman, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405

MOTION FOR CLASS CERTIFICATION